IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

REBECCA HARTMAN, JOSEPH
TURNER, R.H., a Minor, by and through
her Guardian and Next of Friend
REBECCA HARTMAN, and E.T., a
Minor, by and through his Guardian
and Next of Friend JOSEPH TURNER,
on behalf of themselves and all other
persons similarly situated known and
unknown,

        Plaintiffs,

v.

META PLATFORMS, INC.,

        Defendant.

Case No. 3:23-CV-02995-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

In this putative class action, Plaintiffs allege that Defendant Meta Platforms, Inc. ("Meta") violated the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), by improperly collecting and possessing their biometric identifiers and information through its Facebook Messenger and Messenger Kids applications (collectively "Messenger Applications"). (Doc. 23-2). Soon after removing the case to this Court, Meta filed a motion to dismiss the action based, in part, on Plaintiffs' ostensible agreement that California law governed their use of the Messenger Applications. (Doc. 23). The Court denied Meta's motion to dismiss, but deferred ruling on the choice of law challenge, "pending at least some discovery and further briefing under Rule 56 of the Federal Rules of Civil Procedure." (Doc. 42).

The parties proceeded to address the choice of law issue by exchanging relevant documentary evidence and preparing a joint stipulation of facts for the Court's consideration. (Doc. 74). Meta then filed a motion for summary judgment, arguing that California law governed Plaintiffs' use of the Messenger Applications. (Doc. 76). Plaintiffs filed a response in opposition and Meta a reply. (Docs. 79, 83). The Court then held a hearing on December 16, 2025, where both parties offered informative arguments.

Meta has also separately moved for leave to file a second amended answer and affirmative defenses to Plaintiffs' complaint. (Doc. 80). This motion, too, is fully briefed. (Docs. 84, 89). The Court now addresses both motions, beginning with Meta's motion for summary judgment because of its potentially dispositive impact on the case.[1]

## MOTION FOR SUMMARY JUDGMENT (DOC. 76)

### BACKGROUND

Plaintiffs Rebecca Hartman and Joseph Turner each created Facebook accounts for themselves in May 2010 and April 2011 respectively. (Doc. 74 ¶¶ 1, 2, 5 (Joint Stip. of Facts)). This allowed them to use certain products that Meta offered, including Facebook Messenger. (*Id.* ¶ 1). Since creating their accounts, Hartman and Turner "have each used Facebook Messenger regularly during each year from the year in which they created their Facebook accounts until the present year, and they continue to use Facebook Messenger regularly." (*Id.* ¶ 11). Over the years, they have also used Meta's products in other states,

---

[1] Plaintiffs only advance two claims for relief, both arising under BIPA. (Doc. 23-2 ¶¶ 136-150 (Compl.)). Meta's motion for summary judgment based on choice of law, if granted, would be dispositive of the case because the application of California's substantive law necessarily forecloses claims under BIPA, an Illinois statute. *See Hogan v. Amazon.com, Inc.*, No. 21 C 3169, 2022 WL 952763, at *3 (N.D. Ill. Mar. 30, 2022).

including Florida, Arizona, Ohio, and Nevada. (Docs. 78-1, 78-2 (Exhs. 1 & 2 of Decl. of Ross Creighton)).

To create their accounts, Hartman and Turner clicked a button labeled "Sign Up," which led them to a screen showing Meta's "Terms of Use" (now called the "Terms of Service"—for the sake of clarity, the Court will refer to these terms as the "Terms of Service").[2] (Doc. 74-1, p. 2). The second screen in the sign-up process contained a note to prospective users: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Use and Privacy Policy." (*Id.*, p. 3 (blue font in original (Doc. 74 ¶ 6))). The words "Terms of Use" in this note provided a link to the Terms of Service in effect at the time. (Doc. 74 ¶ 3).

The Terms of Service "govern[] [Meta's] relationship with users and others who interact with Facebook." (Doc. 74-3, p. 2). They also stipulate that "[b]y using Facebook, you agree to" their requirements. (*Id.*). References to "Facebook" in the Terms of Service include Facebook Messenger, as do references to "Facebook Services," "Facebook Products," and "Meta Products." (Doc. 74 ¶ 9). The Terms of Service also contained a choice of law provision, which states in full: "The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions." (Doc. 74-2, p. 4; Doc. 74-3, p. 3). This provision has undergone minor wording changes over time, but the Terms of Service have consistently selected the substantive law of California to govern "claims" between Facebook users

---

[2] The "Terms of Service" have, over time, also been called "Statement of Rights and Responsibilities." (Doc. 74 ¶ 3 n.1 (Joint Stip. of Facts)).

and Meta. (Docs. 74-4 through 74-15). The Terms of Service reflect "standardized document[s]" that are offered to people in the United States who want to use Meta's products, including Facebook Messenger. (Doc. 74 ¶¶ 8-10). Individual users are unable to modify the Terms of Service. (*Id.* ¶ 10).

Hartman also created Messenger Kids accounts for her minor children R.H. and E.T. (*Id.* ¶ 12). Meta's records reflect an account that was created for R.H. on January 3, 2021, as well as a "sibling" account that was created on the same day.[3] (*Id.* ¶ 13). To create a Messenger Kids account, Hartman clicked a button labeled "Create Account." (*Id.* ¶ 14; Doc. 74-16, p. 2). Just above the "Create Account" button, the screen offered the following message: "By tapping Create Account, you're consenting to Messenger Kids' Terms and Privacy Policy." (*Id.*). The word "Terms," appearing in blue font, provided a link to the Messenger Kids Terms of Service that were in effect at the time. (*Id.* ¶ 14). These terms "govern[ed] the use by [the user's] child . . . of the Messenger Kids app from Facebook." (74-17, p. 2). And "[b]y creating a Messenger Kids account for your child, you agree to these Terms on your child's behalf." (*Id.*).

The Messenger Kids Terms of Service also contained a choice of law provision selecting California law to govern "any claim" concerning Messenger Kids. (*Id.*, p. 5). That provision stated in relevant part that "the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions." (*Id.*; Doc. 74-18, p. 5). The Messenger Kids Terms of Service have only been changed once since R.H. and

---

[3] For purposes of Meta's motion for summary judgment, the parties accept as undisputed the fact that the "sibling" account was E.T.'s. (*Id.* ¶ 13 n.2).

E.T.'s accounts were created, and that change did not affect the choice of law provision. (Doc. 74 ¶ 16; Doc. 74-17, p. 5; Doc. 74-18, p. 5). Like the Terms of Service, the Messenger Kids Terms of Service are "standardized document[s]" that cannot be modified by individual users. (*Id.* ¶ 17).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

As a federal court sitting in diversity, the Court must apply the choice of law rules of its forum state (Illinois) to determine whether the substantive law of Illinois or California governs the case. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013). This, the parties agree on, but not much more. Plaintiffs and Meta have very different views regarding the proper legal standard that governs the choice of law analysis, and the ultimate result that the analysis produces. Thus, the Court begins with an examination of Illinois's choice of law rules to identify the proper analytical framework. It will then apply that framework to determine whether Illinois or California law governs the case.

1. <u>The Proper Legal Framework</u>

Illinois courts, as a general matter, embrace the choice of law methodologies of the

Restatement (Second) of Conflict of Laws. *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007). Where, as here, the parties chose to apply a certain state's law, section 187 of the Restatement plays an important role. It provides in subsection (1) that the parties' contractual choice of law will be enforced "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (A.L.I. 1971). This subsection "provid[es] for incorporation by reference;" it "is not a rule of choice of law." *Id.* cmt. c. But "even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue," the parties' chosen law will still be applied, *unless*:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* § 187(2). This subsection "applies only when two or more states have an interest in the determination of the particular issue." *Id.* cmt. d.

The Seventh Circuit engaged with these Restatement provisions in *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928 (7th Cir. 1996). *Stromberg* is particularly relevant to the Court's framework analysis because it addressed the enforcement a contractual choice of law clause under Illinois's choice of law rules. In that case, a general contractor, Press Mechanical, hired Stromberg Metal Works as a subcontractor to work on an HVAC

system at a nuclear power station. *Id.* at 929. Press's contract with the owner's contracting agent called for the application of Maryland law and required Press to bind all subcontractors to the terms of the general contract. *Id.* Press's purchase orders to Stromberg, however, contained a choice of law provision selecting Illinois law. *Id.* at 930. When Press became insolvent and was unable to pay Stromberg for its work, Stromberg sued several individuals who it believed controlled Press. *Id.* Stromberg invoked a provision of Maryland law that made a general contractor's directors and officers personally liable for money the general contractor owed to a subcontractor and that it "knowingly retain[ed]" in violation of Maryland law. *Id.* And because Illinois lacked a comparable law, Stromberg's case depended on the application of Maryland law. *Id.*

The court applied Illinois's choice of law rules, focusing on section 187(1) of the Restatement. *Id.* at 933. The Maryland statute that Stromberg invoked did not prohibit waivers. *Id.* Thus, Stromberg "could have agreed by contract to surrender their rights under that law, [and] they were free to accomplish the same thing by choosing Illinois law in gross." *Id.* The court rejected any consideration of section 187(2) because "individual liability could be created or avoided by contract." *Id.* And because that was so, "Illinois would stop with the approach of § 187(1)." *Id.* The court then applied Illinois law because the purchase orders selected it. *Id.* 933-34. *Stromberg* features prominently in Meta's briefs. It believes that *Stromberg*'s application of section 187(1) is "the beginning and the end" of the choice of law analysis here because Plaintiffs expressly agreed that California law "governs [its] relationship with" them, and Plaintiffs could have waived their BIPA rights by contract.

But *Stromberg* is not the Seventh Circuit's only articulation of Illinois law regarding the enforceability of contractual choice of law clauses. Eight years after *Stromberg*, the court explained in an Illinois choice of law analysis that "[w]hen the parties express [an] intent [to be bound by a particular state's law] (such as through a governing law provision), that express intent is *generally* recognized." *Smurfit Newsprint Corp. v. Se. Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004) (emphasis added). It is important to emphasize the word "generally" because the court recognized that "[a]n exception to this general rule arises where the express choice of law 'would *both* violate fundamental Illinois public policy *and* Illinois has a materially greater interest in the litigation than the chosen state.'" *Id.* (quoting *English Co. v. Northwest Envirocon, Inc.*, 663 N.E.2d 448, 452 (Ill. App. Ct. 1996) (emphasis in original)). The court ultimately applied the parties' chosen law (New York) to the contractual dispute because the parties offered no reason to suggest that doing so would violate Illinois public policy and that Illinois had a materially greater interest in the case than New York. *Id.* More recently, the Seventh Circuit reiterated *Smurfit*'s articulation of Illinois law, finding that "a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) (citing *Smurfit*, 368 F.3d at 949). *Smurfit* and *Life Plans* are not alone. They align with other decisions from the Seventh Circuit that have embraced a public policy "exception" as a mandatory check on the enforceability of a choice of law provision. *See, e.g.*, *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000) ("In contract disputes . . . Illinois respects

the contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy"); *Jackson v. Payday Fin, LLC*, 764 F.3d 765, 775 n.23 (7th Cir. 2014) (same); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704-05 (7th Cir. 2004) (same); *accord Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020) (citing *Life Plans* and holding that federal courts sitting in diversity must honor agreed-to choice of law clauses "unless to do so would be contrary to public policy").

So, the Court finds itself in a bind. *Stromberg* and *Smurfit* are aligned in their recognition that Illinois law respects contractual choice of law provisions. But what is apparent from the parties' briefs and their arguments at the hearing is that they may not be fully consistent in their analytical approaches.[4] *Smurfit* makes the consideration of Illinois's public policy and its interest in the case a *mandatory* component of the choice of law analysis. *Stromberg*, on the other hand, says "stop" — quite literally — when the parties chose to apply a particular state's law and the disputed issue could have been resolved by contract. Here, this would mean that, assuming Plaintiffs could have contractually waived their BIPA rights (the Court takes no position on that issue), *Stromberg* would end the analysis with the choice of law provision in the Terms of Service. But if Illinois's public policy and its interest in the case *must* be considered in the first instance, then *Stromberg*'s

---

[4] Counsel for Meta agreed at the hearing that more recent cases from the Seventh Circuit "articulate a different standard" than *Stromberg*. (Dec. 16, 2025 Hr'g Tr., p. 50 (Doc. 93)). He suggested, however, that the post-*Stromberg* panels did so "in the absence of an argument" that would have directed their attention to *Stromberg* and section 187(1) of the Restatement. (*Id.*). The Court is not persuaded that this undermines the viability of the legal standard articulated in *Smurfit* and other cases that endorsed the public policy "exception." Indeed, Judge Terence Evans was on the panel in both *Stromberg* and *Smurfit*. Surely, then, he would have been aware of *Stromberg* when he and his colleagues considered the proper standard for *Smurfit*.

approach under section 187(1) of the Restatement cannot alone be dispositive in the way Meta suggests. And while *Smurfit* and *Life Plans* agree that choice of law clauses should be enforceable as a general matter, they recognize that the chosen law should not be enforced if doing so would violate a fundamental Illinois's public policy and Illinois has a materially greater interest in the case. *Smurfit* and *Life Plans* thus add an exception to the analysis that *Stromberg* does not recognize. So, assuming the requirements of Restatement section 187(1) are met, there is an analytical conflict regarding whether it is necessary to consider Illinois's public policy and its interest in the case before enforcing the choice of law provision in the various Terms of Service. To resolve this conflict, the Court will look to the decisions of the Illinois Supreme Court. *Reiser v. Res. Fund. Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

The Illinois Supreme Court is the "ultimate expositor[]" of Illinois law. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975); *River E. Plaza, LLC v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 721 (7th Cir. 2007). Its decisions indeed "terminate[] the authoritative force" of circuit-level decisions interpreting Illinois law when they diverge. *Reiser*, 380 F.3d at 1029. Thus, the question of how to properly examine the enforceability of the choice of law clauses in this case depends on the analytical framework endorsed by the Illinois Supreme Court. On this point, the court held—six years after *Stromberg*—that "[g]enerally, choice of law provisions will be honored." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) (emphasis added). In support of this proposition, the court cited its decision in *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454 (1975). *Hofeld* also explained that "*generally*, the parties may validly stipulate as to the

applicable law." *Id.* at 458 (emphasis added). But they may do so only "so long as the particular statutory provision to be applied does not conflict with the public policy of this State." *Id.* at 460. *Belleville Toyota* also cited the Illinois Appellate Court's decision in *Hartford v. Burns Int'l Sec. Servs, Inc.*, 526 N.E.2d 463, 464 (Ill. App. Ct. 1988), when it articulated this standard. *Hartford* held that contractual choice of law provisions will be honored "subject to certain limitations." *Id.* These "limitations," consider "whether the choice of law provision contravenes Illinois public policy and whether there is some relationship between the chosen forum and the parties or the transaction." *Id.*

*Belleville Toyota* thus appears to endorse the approach that requires courts to consider, at a minimum, Illinois's public policy before enforcing a choice of law provision calling for the application of foreign law. Indeed, *Stromberg*'s demand that courts "stop" the analysis if a choice of law provision exists and the disputed issue could have been resolved by contract seems irreconcilable with *Belleville Toyota*'s pronouncement that choice of law clauses are only *generally* enforceable. *See Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 915 (N.D. Ill. 2014) (observing that "the parties have not identified nor has the Court found an Illinois case following [*Stromberg*'s] approach."). So, in considering whether to apply *Stromberg* strictly or to engage in a more nuanced analysis, as *Smurfit* and other Seventh Circuit decisions instruct, the Court finds *Smurfit*'s approach to be more aligned with the Illinois Supreme Court's articulation of the law.[5]

---

[5] *Stromberg* is also distinguishable because it determined whether to enforce a choice of law provision calling for the application of *Illinois* law as opposed to a foreign state's law. This is the factual inverse of the situation presented here. Logically, it is much less likely that Illinois public policy would be offended by the application of Illinois law than it would be by the application of another state's law. *See Hendricks v. Novae Corp. Underwriting, Ltd.*, 868 F.3d 542, 545 (7th Cir. 2017) ("The parties chose Illinois law, and there's

The Restatement also supports this finding. It recognizes that the "[f]ulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interest and for state regulation." Restatement (Second) of Conflict of Laws § 187 cmt. g. This means that "[t]he chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties." *Id.* This comment validates *Belleville Toyota*'s and *Smurfit*'s concern for Illinois's public policy, its interest in the litigation, and other considerations that counsel against blind enforcement of an agreed-to choice of law provision. The Restatement also acknowledges that choice of law provisions in adhesion contracts may trigger heightened scrutiny before they are enforced. An adhesion contract "is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Id.* cmt. b. The Terms of Service appear to fit the bill of an adhesion contract. They are "standardized document[s]," offered to people in the United States who want to use Meta's products, including the Messenger Applications. Individual users are unable to modify them. And as the Restatement explains, courts "will refuse" to apply choice of law provisions in adhesion contracts if their enforcement

---

no concern that its application would violate Illinois public policy."). Thus, although *Stromberg* is firmly based on the considerations of Restatement section 187(1), it is important to recognize that the panel was not presented with a scenario that would have warranted the consideration of Illinois public policy in the same way it must be considered here. *See Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 812 (N.D. Ill. 2022) (recognizing, under similar circumstances, that "enforcing the choice-of-law provision would *preclude*, rather than require, the application of Illinois law, which is a much different outcome for the purpose of assessing this state's public-policy concerns") (emphasis in original); *accord Hogan*, 2022 WL 952763, at *4.

"would result in substantial injustice to the adherent." *Id.*; *see also Hofeld*, 322 N.E.2d at 528-29 (recognizing that choice of law provisions are more likely to be enforced when contracting parties have comparable "bargaining position[s].").

So, where does this leave the Court's framework analysis? As a lower court in a hierarchical system, the Court is bound by the Seventh Circuit's interpretations of Illinois law absent a conflict with the Illinois Supreme Court. *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 714 (7th Cir. 2024). This means that here, it must consider whether applying California law "would violate fundamental Illinois public policy" and whether "Illinois has a materially greater interest in the litigation" than California. *Life Plans*, 800 F.3d at 357 (citing *Smurfit*, 368 F.3d at 949). These considerations track two of the three considerations identified in subsection 187(2)(b) of the Restatement, which the Illinois Supreme Court has adopted to guide its conflict of law determinations.[6] Moreover, because the Illinois Supreme Court adopted *Hofeld*'s directive to consider, at a minimum, a choice of law provision's potential conflict with Illinois public policy, the Court is satisfied that *Smurfit* provides the applicable legal standard. Thus, the Court will consider whether to enforce the choice of law provision in the Terms of Service under the *Smurfit* framework. *See Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 811-13 (N.D. Ill. 2022)

---

[6] The Court has found no Illinois Supreme Court case that engages specifically with section 187 of the Restatement. Several decisions of the Illinois Appellate Court have applied section 187, however, and have utilized a similar approach to the one laid out in *Smurfit. See e.g., Dancor Constr., Inc. v. FXR Constr., Inc.*, 64 N.E.3d 796, 812-13 (Ill. App. Ct. 2016) (focusing on Restatement section 187(2) considerations); *Old Republic Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, 906 N.E.2d 630, 636 (Ill. App. Ct. 2009) (applying Nebraska law because "exceptions" under section 187(2) did not warrant displacement of party's choice of law); *Ocon v. Thermoforming Sys., LLC*, No. 1–12–1670, 2013 WL 2643511, at *5 (Ill. App. Ct. June 10, 2013) (rejecting argument that analysis under section 187(1) is dispositive because "[g]iven the importance of the role of Illinois policy in determining whether to uphold a choice-of-law provision, we review the choice-of-law clause in light of the other Restatement rules.").

(analyzing enforceability of Washington choice of law provision in BIPA case under *Smurfit* standard).

2.  Choice of Law

The Court will only refuse to enforce the parties' choice of California law if doing so violates a fundamental public policy of Illinois *and* Illinois has a materially greater interest in the litigation than California. Because this test is conjunctive, the analysis will not proceed beyond the consideration of Illinois's public policy if the application of California law would not subvert it.

a.  Illinois Public Policy

A state's public policy "may be sought in its constitution, legislative enactments and judicial decisions." *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 739 N.E.2d 1263, 1270 (Ill. 2000). To override a chosen state's law, however, the public policy in question must be "fundamental." *Smurfit*, 368 F.3d at 949. A fundamental policy may not be "obsolete" or so general that most (if not all) other states have adopted it, like the need for consideration in a contract. Restatement (Second) of Conflict of Laws § 187 cmt. g. But a fundamental policy "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Id.*

When it enacted BIPA in 2008, the Illinois legislature recognized that people's biometrics needed robust protection. This was so because biometrics are inherently unique and immutable. 740 ILCS 14/5(c). And because their use was "growing" in business and commercial settings,—*e.g.*, through "biometric-facilitated financial

transactions"—the legislature was concerned that if biometrics are compromised, people would be at "heightened risk for identity theft." *Id.* § 14/5(a)-(c). Accordingly, the legislature determined that "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." *Id.* § 14/5(g).

BIPA is the product of these legislative findings. It codifies the principle that "individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019). It does so by regulating the collection, retention, use, and destruction of people's biometric "identifiers" and "information" in Illinois. 740 ILCS 14/15. Private entities that collect and retain biometric identifiers and information must take certain steps to ensure that they are securely and transparently handled. *Id.* § 14/15(a)-(b). This includes strict retention and destruction requirements, *Id.* § 14/15(a), the need to obtain written consent before collecting or otherwise obtaining a person's biometrics, *Id.* § 14/15(b), and a prohibition on the sale of biometrics, *Id.* § 14/15(c). Most importantly, however, the legislature created a private right of action, allowing individuals to enforce BIPA's requirements against covered entities who misuse their biometric identifiers or information. *Id.* § 14/20(a). The Northern District of Illinois found that "[g]iven these distinct features and clear language, . . . BIPA reflects a fundamental Illinois public policy of protecting individual privacy rights in biometric information." *Patterson*, 593 F. Supp. 3d at 811; *see also In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1169 (N.D. Cal. 2016) ("There can be no reasonable doubt that [BIPA] embodies a fundamental policy

of the state of Illinois."). The Court agrees with these findings.

The question remains, however, whether the application of California law would *violate* this fundamental public policy. Meta contends that the application of a foreign state's law only violates Illinois's fundamental public policy if doing so is "contrary to pure morals and abstract justice." (Doc. 76, p. 24 (Def. Mot. for Summary Judgment) (quoting *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 754 (Ill. App. Ct. 1987)). It further maintains that this standard is not met where the relevant states' respective policies and laws are, in its words, "directionally aligned." (*Id.*). And because California and Illinois both seek to protect biometric privacy rights while encouraging technological innovation, so Meta's argument goes, the application of California law in this case does not violate a fundamental public policy of Illinois. (*Id.*, p. 26).

Here too, the Court questions whether the Illinois Supreme Court is on board with this articulation of the relevant legal standard. It has explained that "[i]n deciding whether an agreement violates Illinois public policy, [courts] must determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the *public interest*." *Country Pref. Ins. Co. v. Whitehead*, 979 N.E.2d 35, 42 (Ill. 2012) (emphasis added). "An agreement will not be invalidated unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy of Illinois, or unless it is manifestly injurious to the public welfare."[7]

---

[7] In *Whitehead*, the court found that a two-year contractual limitations period for uninsured motorist claims did not violate Illinois's public policy because Illinois itself imposed a two-year statute of limitations on such claims. *Whitehead*, 979 N.E.2d at 47.

*Id.* at 43. Ultimately, it is not necessary to explore the nuances of whether and, if so, how, a violation of the "public interest" differs from a violation of "pure morals and abstract justice" because any difference would not be outcome-determinative. Nevertheless, the Court will follow *Whitehead*'s formulation of the applicable standard because it is the one chosen by the Illinois Supreme Court. The Court's analysis, moreover, is confined to the question of whether the application of California law *in this case* would subvert a fundamental public policy of Illinois. *See id.* ("Whether an agreement violates public policy depends on the particular facts and circumstances of the case.").

Meta cites the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* ("CCPA") as California's legislative analog to BIPA. It argues that the CCPA, like BIPA, "reflect[s] a policy of protecting biometric privacy" (Doc. 76, p. 26) and that, as a result, the application of California law in this case is not at odds with Illinois's fundamental public policy on the same issue. Plaintiffs respond by pointing out that the California legislature limited the CCPA in critical ways, and that these limitations negate a potential alignment between Illinois's and California's respective laws and policies.

First, the CCPA applies only to California residents. Cal. Civ. Code § 1798.140(i) (defining "[c]onsumer" as "a natural person who is a California resident"). Thus, its biometric privacy protections are not available to Illinois citizens, whose biometric identifiers and information would be left without statutory protection under California law. *See Barbara's Sales*, 879 N.E.2d at 921 (applying Illinois law in choice of law dispute, in part, because "California has no interest in extending its laws to noncitizens and to actions that occurred outside of California borders."). The exclusion of Illinois citizens

from the CCPA indicates a conflict with Illinois public policy, rather than an alignment, because "Illinois might prefer to apply its law if it would better protect Illinois consumers." *Id.* at 920.

Second, enforcement authority under the CCPA is vested in the Attorney General of California. Cal. Civ. Code § 1798.199.90(a). The statute only permits a private right of action in case of a data breach, and even then, as noted, only California residents may bring an action. *Id.* § 1798.150. But by eliminating a private right of action under BIPA, which the application of California law would do in this case, Meta would achieve a goal that is antithetical to the very state policy that BIPA serves to protect. *See Rosenbach*, 129 N.E.3d at 1207 (recognizing that private right of action was intended to have "substantial force" because it supports BIPA's "preventative and deterrent purposes."). The Northern District of California described this policy conflict succinctly in a similar case. The lack of an available private right of action for Illinois citizens, it explained, "highlights one of the fundamental conflicts between California and Illinois law: BIPA's private right of action reflects the legislature's judgment that a violation of BIPA's procedures would cause actual and concrete harm. When an online service simply disregards the Illinois procedures, as Facebook is alleged to have done, the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized." *Delgado v. Meta Platforms, Inc.*, 718 F. Supp. 3d 1146, 1155 (N.D. Cal. 2024) (citation modified).

The CCPA's limitations have consequences for the analysis of whether the choice of law provision at issue here is consistent with Illinois's fundamental public policy. The

Illinois legislature made certain policy judgments in crafting BIPA to protect the right of Illinois citizens to biometric privacy. It stands to reason, then, that when the exact people who BIPA sought to protect allege that this right was violated, "the relevant policy interest of Illinois would be to apply Illinois law to the claims of Illinois consumers." *Barbara's Sales*, 879 N.E.2d at 921. And when the application of a foreign state's law results in the negation of a statutory privacy right belonging to Illinois citizens, the violation of Illinois's fundamental public policy appears complete. *Delgado*, 718 F. Supp. 3d at 1155.

Meta nevertheless insists that even when the application of foreign law is outcome-determinative, Illinois public policy is not subverted to a degree that justifies the displacement of a choice of law clause. But the cases it cites in support of this proposition are inapposite. In *Hofeld*, the Illinois Supreme Court enforced a choice of law provision selecting Georgia law to govern a group life insurance policy that had been issued to the plaintiff's decedent. *Hofeld*, 322 N.E.2d at 456, 461. Under Illinois law, insurance policies had to include the basis of a defense to an insurance claim in the policy itself or attach the written application to the policy (which included the basis for the defense) before an insurance provider could invoke the defense. *Id.* at 460. Georgia law did not offer a similar requirement. *Id.* But while the Illinois requirement applied to insurance policies *generally*, the court found that Illinois law contained no such requirement for group insurance policies *specifically*. *Id.* And because this requirement was absent from the specific regulatory provisions governing the policy in question, the application of Georgia law did not violate Illinois's public policy. *Id.* at 461. *Hofeld* is thus distinguishable because the enforcement of a foreign state's law did not expose the

plaintiff to legal requirements that radically departed from those she would have encountered in Illinois—at most, she lost the ability to invoke a general statutory provision that may (or may not) have been available to her.

Meta also relies on *Mell v. Goodbody & Co.*, 295 N.E.2d 97 (Ill. App. Ct. 1973), for the proposition that choice of law provisions must be enforced even if doing so causes a party to relinquish a statutory right under Illinois law. *Mell* supports that proposition generally, but it did so with respect to an Illinois usury statute that capped certain interest rates at a lower rate than New York law (the parties' chosen law). *Id.* at 98-99. The cap certainly reflected an Illinois public policy, but the application of New York law did not mean that the plaintiff was left without *any* protection because New York had its own usury regime—albeit one that permitted a higher interest rate. *Id.* at 100. Here, by contrast, the closest statutory analog to BIPA that Meta presents (the CCPA) is wholly inapplicable to Plaintiffs. The Court thus finds *Mell*'s persuasive force limited. The other cases Meta addresses in some depth are also unpersuasive because they either support a finding of a conflict with a fundamental public policy of Illinois, *Lyons v. Turner Constr. Co.*, 551 N.E.2d 1062, 1066 (Ill. App. Ct. 1990), or deal with non-substantive differences in state law that do not warrant the displacement of a choice of law provision that was negotiated at "arms-length," *Potomac Leasing*, 509 N.E.2d at 759 (Illinois law required notice of contract cancellation whereas Michigan law did not).[8]

---

[8] Meta also cites a decision from the Northern District of Texas, *Baker v. Match Grp., Inc.*, No. 3:23-CV-02761-N, 2024 WL 4626079, at *4 (N.D. Tex. Oct. 30, 2024), to support its argument that the enforcement of the choice of law clause in this case does not violate a fundamental public policy of Illinois. But *Baker* is distinguishable for two reasons. First, it applied the choice of law rules of Texas, which means the court's analysis was subject to different legal authorities. Second, *Baker* found that Texas's biometric privacy

On the other side of Meta's argument is a line of recent BIPA cases that concluded
that the application of foreign law would violate Illinois's fundamental public policy. In
*Patterson* and *Hogan*, for instance, the Northern District of Illinois found that the
enforcement of Washington choice of law provisions would violate a fundamental public
policy of Illinois, even though Washington had its own biometric privacy statute, which
allowed the state's Attorney General to enforce it. *Patterson*, 593 F. Supp. 3d at 812-13;
*Hogan*, 2022 WL 952763, at *4. Applying Washington law, *Hogan* held, "would rob
Plaintiffs of control over their individual biometric information, instead leaving it to
Washington's attorney general to bring suit. Enforcing the choice-of-law provision would
thus undermine fundamental Illinois public policy." *Id.*

And the federal courts of Illinois are not alone. The Northern District of California
reached the same conclusion when presented with a choice of law provision that would
have vitiated the plaintiffs' BIPA rights. That court recognized in *Facebook Biometric* that
"enforcing the contractual choice of California law would be contrary to [Illinois] policy
in the starkest way possible." *Facebook Biometric*, 185 F. Supp. 3d at 1169. And while Meta
distinguishes *Facebook Biometric* on the basis that it was decided before California enacted
the CCPA, that argument did not move the needle for the Northern District of California,

---

statute, known as Capture or Use of Biometric Identifier ("CUBI"), contained no language limiting its
protections to Texas residents. *Id.* And while enforcement under CUBI was left to the Attorney General of
Texas, the Court found that "[w]here . . . a company is collecting biometric data without consent from
nationwide consumers – including both Texans and Illinoisans – the Texas Attorney General would have
a vested interest in pursuing claims against that company for all impacted." *Id.* at *5. Here, Meta does not
seem to contend that the California Attorney General would have a similar "vested interest" in pursuing
biometric privacy claims on behalf of Illinois citizens. Indeed, because the CCPA is expressly limited to
California residents, the opposite appears to be true. Moreover, other courts have reached different
conclusions than *Baker* on this issue, and the Court finds their decisions more instructive. *See Delgado*, 718
F. Supp. 3d at 1155; *Patterson*, 593 F. Supp. 3d at 812; *Hogan*, 2022 WL 952763, at *4.

which held in *Delgado* that the fundamental policy conflict is not ameliorated by the existence of the CCPA due to its limited reach. *Delgado*, 718 F. Supp. 3d at 1155. So, as these authorities recognize, all roads lead to the impact that enforcement of the choice of law provision would have here: the negation of a critical statutory privacy right belonging to Illinois citizens and the concomitant denigration of the "public interest." Thus, the Court finds that enforcing the choice of law provision in the Terms of Service would violate a fundamental public policy of Illinois.[9]

### b. Illinois's Interest in the Case

To overcome the choice of law provision in the Terms of Service, Plaintiffs must also show that Illinois has a materially greater interest in the case. To that end, they contend that Meta's alleged violations of BIPA occurred in Illinois, and that Illinois has a significant interest in ensuring that its citizens receive the protection that the legislature gave them. Meta's principal argument, on the other hand, is that California's interest in the case is at least in equipoise with that of Illinois. This is so, Meta argues, because California's burgeoning tech sector relies on California's laws to provide certainty and predictability. And because Meta is headquartered in California, it contends that

---

[9] Meta has also argued that Plaintiffs could pursue a claim for intrusion upon seclusion under California law. It cites two district court cases that have allowed plaintiffs to pursue such claims while also advancing claims under BIPA. *See Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 WL 672951, at *10 (N.D. Ill. Mar. 3, 2025); *Ji v. Naver Corp.*, No. 21-cv-05143, 2022 WL 4624898, at *10 (N.D. Cal. Sept. 30, 2022). But Meta offers no analysis of the differences and similarities between this theory of liability and BIPA. As Plaintiffs point out, an intrusion upon seclusion claim under California law requires proof of "intentional" and "highly offensive" conduct by the defendant. *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009). BIPA approaches biometric privacy protection differently, for instance, by imposing written consent, and retention and destruction requirements. 740 ILCS 14/15(a)-(b). And while an intrusion upon seclusion claim *may* provide relief for similar privacy violations that BIPA addresses, the Court is not persuaded that its availability remedies the fundamental policy conflict at issue here.

California has a compelling interest in having its laws applied. The Court agrees with
Meta that California has an interest in having its laws applied to companies that call
California home. But it parts ways with Meta's determination of the weightiness of that
interest.

On one side of the interest scale is California—home to many of the country's
flagship technology companies, including Meta. On the other side is Illinois, whose
citizens used the political process to create BIPA, which protects them from identity theft
and other consequences that flow from the loss of biometric privacy. The Northern
District of Texas, in a case Meta cited extensively, offered a poignant observation of the
interests at play. It held that "[b]ecause the welfare of state residents is generally
considered a greater interest than the corporate expectations of a national corporation,
Illinois has a materially greater interest than Texas." *Baker v. Match Grp., Inc.*, No. 3:23-
CV-02761, 2024 WL 4626079, at *4 (N.D. Tex. Oct. 30, 2024). Indeed, "[t]aken alone, the
mere fact of corporate domicile is not compelling." *Patterson*, 593 F. Supp. 3d at 813. And
when corporate domicile is balanced against another state's interest in protecting the
rights of its citizens, the state whose protective legislation is on the line often has a
materially greater interest in the outcome of the case. *See Vance v. Microsoft Corp.*, 534 F.
Supp. 3d 1301, 1312 (W.D. Wash. 2021) ("Illinois made clear through BIPA that it has
substantial interest in protecting its residents' biometric data, even if the harm is inflicted
by an out-of-state corporation."). Thus, California's interest in the litigation based on
Meta's domicile does not carry the weight that Meta attributes to it. The Court finds
*Hogan*'s rejection of a similar argument instructive, where the court found that "[t]he fact

that Amazon is headquartered in Washington and employs workers there does not give Washington a greater interest" in the case than Illinois. *Hogan*, 2022 WL 952763, at *5. Accordingly, Meta's domicile in California does not undermine Illinois's materially greater interest in this litigation.

Meta also contests the significance of Illinois's contacts to the case compared to California's. It maintains that while its activities, including the conduct at issue, are centered in California, Plaintiffs used its products in Illinois and elsewhere. Thus, the "gravamen" of relevant conduct occurred in California, which, according to Meta, supports California's interest in the case. The Ninth Circuit rejected a similar argument in *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019). There, the court examined the question of "where the essential elements of a BIPA violation take place" in the context of a class certification dispute under Federal Rule of Civil Procedure 23(b)(3). *Id.* Meta (at the time known as Facebook) argued that the district court erred in certifying a class under Rule 23 because BIPA did not apply extraterritorially. *Id.* at 1275. Thus, Meta maintained that common questions of law and fact did not "predominate" under Rule 23(b)(3) because a court "would have to conduct countless mini-trials to determine whether the events in each plaintiff's case occurred primarily and substantially within Illinois." *Id.* (quotation marks omitted). The court disagreed. It found that "[i]f the violation of BIPA occurred when the plaintiffs used Facebook in Illinois, then the relevant events occurred primarily and substantially in Illinois, and there is no need to have mini-trials on this issue." *Id.* at 1276 (quotation marks omitted).

Here, Plaintiffs' episodic use of Meta's products in other states does not

undermine Illinois's interest in the case, nor does it enhance California's. While Meta cites certain instances in which Plaintiffs used their Facebook accounts while travelling outside of Illinois (including in Nevada, Arizona, Ohio, and Florida), there is no indication that they did not use Meta's products primarily and substantially in Illinois, their home state. This is a critical piece of the evidentiary puzzle because "it is reasonable to infer that the [Illinois] General Assembly contemplated BIPA's application to individuals who are located in Illinois, even if some relevant activities occur outside the state." *Id.* This commonsense inference also suggests that Plaintiffs' periodic use of Meta's products in other states does not undermine Illinois's materially greater interest in the case.

Considering the interests at stake, it is apparent that "Illinois will suffer a complete negation of its biometric privacy protections for its citizens if California law is applied. In contrast, California law and policy will suffer little, if anything at all, if BIPA is applied." *Facebook Biometric*, 185 F. Supp. 3d at 1170. The imbalance of harm in *Facebook Biometric* justified a finding that Illinois had a materially greater interest in the case than California. *Id.* The same is true here. Illinois has a materially greater interest in this litigation than California because the application of California law would result in the evisceration of one of the state's critical pieces of privacy legislation. And this is so, even though Meta is domiciled California and Plaintiffs occasionally used Meta's products outside of Illinois.

In sum, the Court declines to apply California law in this case because doing so would violate a fundamental public policy of Illinois and Illinois has a materially greater

interest in this litigation than California.[10] Accordingly, Illinois law will govern the case going forward.

CONCLUSION

For these reasons, Meta's Motion for Summary Judgment based on Choice of Law (Doc. 76) is **DENIED**.

## MOTION FOR LEAVE TO FILE SECOND AMENDED ANSWER (DOC. 80)

Meta has separately moved for leave to file a second amended answer and affirmative defenses to Plaintiffs' complaint. (Doc. 80). Its motion focuses on a single affirmative defense: the exclusion of state and local government contractors and subcontractors from BIPA's reach. *See* 740 ILCS 14/25(e) ("Nothing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit

---

[10] The Court has confined its choice of law analysis to the considerations of Illinois's public policy and its interest in the case, consistent with the *Smurfit* framework. Section 187(2)(b) of the Restatement, however, instructs courts to also identify the state "which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Section 188, in turn, seeks to identify the state with the "most significant relationship to the transaction and the parties," based on "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." The consideration of these factors would not change the result here.

As we know, the Terms of Service were not negotiated—they were "standardized document[s]," which Plaintiffs could not modify. Thus, the place of negotiation is not particularly important. The domiciles of the parties are Illinois for Plaintiffs and California for Meta (based on its principal place of business). This factor is consequently balanced. The place of contracting and place of performance are more likely to favor Illinois because, with respect to the parties *in this case*, it is the state where Plaintiffs signed up for Facebook and where they predominantly used Meta's products. *Cf. Patel*, 932 F.3d at 1276. Finally, the location of the subject matter of the contract does not tip the scale in Meta's favor because biometric identifiers and information are not tangible items subject to one specific location at a time. *See* Restatement (Second) of Conflict of Laws § 188 cmt. e (location of subject matter of contract is important "[w]hen the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment."). Thus, the Court is satisfied that, under the considerations of Restatement section 188, Illinois also has the "most significant relationship to the transaction and the parties" in this case.

of government when working for that State agency or local unit of government."). Plaintiffs oppose Meta's motion, arguing that it has not pursued this defense diligently and that its delayed assertion of it is not justified under Rules 15(a)(2) and 16(b)(4) of the Federal Rules of Civil Procedure.

Before addressing Meta's request for leave, the Court must determine whether leave is required at all. Federal Rule of Civil Procedure 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Rule 15(a)(2), however, allows parties to amend their pleadings (including an answer and affirmative defenses) with the opposing party's consent or the court's leave, and courts should not be "stingy" in granting leave. *Global Tech. & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 733 (7th Cir. 2015). But is Meta's invocation of section 14/25(e) an "affirmative defense" subject to this requirement? Meta says no and argues that section 14/25(e) of BIPA provides an "ordinary" defense, not subject to Rule 8(c). Plaintiffs, on the other hand, contend that it is an affirmative defense and that leave is required before Meta can raise it.

In a diversity action, "a defense is an affirmative defense (a) if the defendant bears the burden of proof under state law or (b) if it does not controvert the plaintiff's proof." *Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012) (citation modified). Thus, state law guides the determination of whether section 14/25(e) is subject to Rule 8(c)'s pleading requirement. *Id.*

BIPA's substantive provisions apply to "private entit[ies]." 740 ILCS 14/15. A private entity is defined as "any individual, partnership, corporation, limited liability

company, association, or other group, however organized." *Id.* § 14/10. *Excluded* from

this definition are "State or local government agenc[ies]" and "any court of Illinois, a clerk

of the court, or a judge or justice thereof." *Id.* The statute's definition of a "private entity"

thus says nothing about "contractor[s]" and "subcontractor[s]" of state and local

governments. That issue is addressed in section 14/25(e), which, as noted, exempts from

liability state or local government contractors and subcontractors "when working for that

State agency or local unit of government."

No one disputes that it is Plaintiffs' burden to demonstrate Meta's status as a

"private entity" under BIPA as part of their prima facie case. But the Court is skeptical

that a refutation of Meta's status as a state or local government *contractor* is part of that

burden. Indeed, BIPA's definition of a "private entity" and section 14/25(e) do not

mention each other at all. "The Illinois legislature could have chosen to write into the

definition of 'private entity' that financial institutions, affiliates of financial institutions,

and contractors, subcontractors, and agents of state or local governments were not

included in the term 'private entity,' but it did not." *Gaertner v. Commemorative Brands,

Inc.*, No. 23-cv-02452, 2025 WL 931290, at *8 (S.D. Ill. Mar. 27, 2025). And because the

contractor exemption under section 14/25(e) is not part of BIPA's definition of a "private

entity," it seems illogical to require Plaintiffs to refute it in their complaint. *See Mayhew v.

Candid Color Sys., Inc.*, 743 F. Supp. 3d 994, 1011 (S.D. Ill. 2024) (holding that plaintiffs

"were not required to plead around § 25(e)"); *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th

636, 640 (7th Cir. 2022) (plaintiff's complaint "need not anticipate or refute potential

affirmative defenses."). It follows, then, that Meta bears the burden of proof with respect

to section 14/25(e), thus validating the exemption's role as an affirmative defense subject to Rule 8(c). With that, the Court turns to the question of whether Meta should be granted leave to amend its answer and affirmative defenses.

Under Rule 15(a)(2), litigants "may" amend their pleadings with leave of court (or the opposing party's consent) and courts "should freely give leave when justice so requires." Of course, this permissive standard is not a free-for-all. A district court may deny leave under Rule 15(a)(2) "for a variety of reasons, including undue delay and futility." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014).

In addition to these well-established standards, the Court must consider an additional wrinkle: the expiration of the deadline for the parties to move to amend their pleadings. In the Court's scheduling order, entered on November 5, 2024, it set a deadline of February 3, 2025, to move to amend the pleadings. (Doc. 58-1). Meta, however, did not file the instant motion for leave to amend its answer until September 3, 2025. This brings Rule 16(b)(4) into play, which states that case-specific scheduling orders "may be modified only for good cause and with the judge's consent." Rule 16(b)(4) "require[s] [the moving party] to show good cause for amendment, a standard that primarily considers the diligence of the party seeking amendment." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 832 (7th Cir 2016) (quotation marks omitted). Given the "tension" between the standards articulated in Rules 15(a)(2) and 16(b)(4), the Seventh Circuit has held that "a district court may apply the heightened good-cause standard of Rule 16(b)(4) before considering whether the requirements of Rule 15(a)(2) were satisfied." *Cage v. Harper*, 42 F.4th 734, 743 (7th Cir. 2022); *see also Sumrall v. LeSea, Inc.*,

104 F.4th 622, 630 (7th Cir. 2024) ("[P]ost-deadline amendments create a two-step

process.") (quotation marks omitted). The Court will follow this approach and consider,

first, whether Meta has offered "good cause" for its request to file a second amended

answer. If good cause exists, the Court will determine whether leave to amend is

appropriate under Rule 15(a)(2).

**Rule 16(b)(4).** Meta's counsel explains that his client became aware of the potential

availability of a defense under section 14/25(e) in the "months" before it filed the instant

motion. (Doc. 80-1 ¶ 4 (Decl. of Atty. Gary Feinerman)). Before filing the motion, Meta

"t[ook] care to assess the legal and factual merits of this defense." (*Id.* ¶ 5). This process

"included a thorough review of Section 25(e) case law and a review of Meta's internal

records to ensure that it has a good-faith basis for asserting the defense." (*Id.*). Meta then

filed its motion "only after it was satisfied that it could assert the defense in good faith."

(*Id.* ¶ 6).

Diligence is the "primary consideration" in a good cause analysis under Rule

16(b)(4). *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). The record here

establishes Meta's diligence. The fact that Meta took "months" to evaluate the legal and

factual bases for a defense under section 14/25(e) does not indicate a lack of diligence—

it shows the devotion of professional care before committing its and Plaintiffs' resources

to the exploration of this defense in discovery. *See Patrick v. Cowen*, No. 3:14-cv-782, 2015

WL 13668669, at *2 (N.D. Ind. Mar. 26, 2015) (good cause established under Rule 16(b)(4)

where counsel consulted with client, reviewed documents, and conducted legal research

before seeking leave to amend). And because the parties and the Court agreed to

prioritize the resolution of Meta's choice of law motion before addressing the substantive aspects of Plaintiffs' claims (Docs. 71, 73), it was not unreasonable for Meta to act with deliberate care before raising a defense that has nothing to do with choice of law. Thus, Meta has demonstrated "good cause" to modify the deadline to amend its answer.

**Rule 15(a)(2).** Under Rule 15(a)(2), "district court[s] ha[ve] the discretion to allow an answer to be amended to assert an affirmative defense not raised initially." *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005). This part of the analysis generally turns on whether, and if so, how, the opposing party would be prejudiced by the amendment. *Global Tech.*, 789 F.3d at 731-33. But "where the plaintiff has an opportunity to respond to a late affirmative defense, he cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint." *Williams*, 399 F.3d at 871. It is thus not surprising that cases justifying the denial of leave to amend are "exceedingly rare." *Empress Casino*, 831 F.3d at 832.

Plaintiffs do not claim that Meta's delayed invocation of a section 14/25(e) defense prejudices them. Nor could they. Prejudice in the context of a request for leave to amend means "a reduction in the plaintiff's ability to meet the defense on the merits—if, say, a witness has died, or documents have been destroyed, during the time between when the defense should have been raised and when it was actually raised." *Global Tech.*, 789 F.3d at 732. Here, fact discovery remains ongoing, and the Court has already signaled its willingness to extend the discovery deadline due to the pendency of Meta's choice of law motion. *See* (Doc. 73) (recognizing in an order entered on May 15, 2024, that in light of need to resolve choice of law issue, "the parties may request extensions of the Scheduling

Order if the need arises."). Plaintiffs will thus have every opportunity to rebut Meta's invocation of section 14/25(e) in discovery. And even if Meta should have been aware of the potential availability of this defense earlier than it was, "legitimate ignorance or oversight" can still support leave to amend under appropriate circumstances. *McCoy*, 760 F.3d at 687. So, considering the lack of prejudice to Plaintiffs and the nascent stage of substantive fact discovery, the Court is satisfied that this case has not reached a point at which "justice" under Rule 15(a)(2) would be subverted by allowing Meta to file a second amended answer and affirmative defenses.

Finally, Plaintiffs contend that Meta's proposed affirmative defense is futile because it has not alleged facts showing that it is a contractor or subcontractor "of a State agency or local unit of government" or that its relevant conduct in this case took place "when working for that State agency or local unit of government." They contend that this omission is fatal because, as the Northern District of Illinois recently recognized in *Payton v. Union Pac. R.R. Co.*, No. 24 C 153, 2025 WL 2462963, at *3 (N.D. Ill. Aug. 25, 2025), "by including the language 'when working for that State agency or local unit of government,' the Legislature intended to require a nexus between the BIPA violation and the scope of the defendant's work with the government." Plaintiffs maintain that Meta seeks to invoke section 14/25(e) as a "broad categorial exemption" from liability, contrary to the narrower construction offered in *Payton*. This argument seems like a candidate for resolution on summary judgment, after the parties have explored the nature and timing of Meta's purported work as a state or local government contractor. But a non-binding decision from a fellow district court, no matter how well-reasoned, does not mean that

Meta's invocation of section 14/25(e) is futile. *See E-Z Dock, Inc. v. Snap Dock, LLC*, No. 1:21-cv-02761, 2023 WL 1783678, at *7 (S.D. Ind. Feb. 6, 2023) (recognizing that "while a plaintiff's arguments against such a defense may ultimately prove well taken, that decision is for another day; a potential weakness in a defense does not equate with futility") (quotation marks omitted).

For these reasons, Meta's Motion for Leave to file a Second Amended Answer and Affirmative Defenses to Plaintiffs' Complaint (Doc. 80) is **GRANTED**. Meta shall file a second amended answer and affirmative defenses on or before **February 27, 2026**.

IT IS SO ORDERED.

DATED:  February 20, 2026

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**